## Morse v. Ellen W. Duryea, et al.

## Rogers, et al. v. Same.

## The Big Sandy Company v. Same.

(Decided February 23, 1917.)

### Appeals from Pike Circuit Court.

1. Fraud—Deed—Misrepresentation as to Title—Rescission.—To avoid a deed on the ground of misrepresentation as to title, the misrepresentation must be one of fact and not of pure law or a mere erroneous expression of opinion.

2. Fraud—Deed—Misrepresentation as to Title—Rescission.—Plaintiff, who was the owner of the mineral rights in certain lands, conveyed the same to defendant, who, together with another, held title under Virginia land grants. The consideration was an agreement by the defendant to bear all expenses, make a sale of the land, and to pay to plaintiff 25 per cent. of the gross proceeds. In a suit to set aside the conveyance on the ground that it was induced by the fraudulent representation of the defendant that his title was superior to that of the plaintiff and plaintiff's title was worthless: Held, that as all the facts were laid before plaintiff's husband, who acted as her agent, such statement was not a misrepresentation of fact but a mere erroneous expression of opinion as to the validity of conflicting titles, or a misrepresentation of pure law that would not avoid the contract.

3. Deeds—Consideration.—Where land is conveyed to another under an agreement whereby he is to bear all expenses, make a sale thereof and pay the grantor one-fourth of the gross proceeds of the sale, such agreement is a sufficient consideration for the conveyance, especially where the agreement has been substantially executed.

4. Attorney and Client—Lien on Land Held by Client Absolutely But Under a Trust Agreement—Validity.—Where the grantee of land holds the land in trust for the purpose of sale and a division of the proceeds between him and the grantor, but the deed under which he holds is absolute in form, a judgment lien obtained by an attorney for legal services performed for the grantee, without knowledge of the trust agreement and in the belief that the grantee's title was absolute, is valid and enforcible, where the deeds from the grantor to the grantee and from the grantee to the purchaser have been held valid and after the payment of the lien the proceeds are sufficient to pay the portion going to the grantor.

5.  Attorney and Client—Services of Attorney as Real Estate Broker
    —Lien.—An attorney who acts in the capacity of a real estate
    broker in making a sale of his client's land is not entitled to a lien
    thereon for his commission.

6.  Taxation—Land of Married Woman—Notice—Tax Sale—Validity.
    —Where the purchaser at a tax sale of the lands of a married
    woman is an individual and fails to give the notice required by
    section 4156 of the Kentucky Statutes the tax sale is invalid.

J. M. ROBERSON and R. H. COOPER for E. Rollins Morse.

AUXIER, HARMAN & FRANCIS and STRATTON & STEPHEN-
SON for Fon and Lon Rogers.

T. H. HARMAN and J. J. MOORE for Big Sandy Company.

YORK & JOHNSON, Z. T. VINSON, J. M. YORK, J. R. JOHNSON,
JR., for appellees, Ellen W. & H. B. Duryea.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY,
COMMISSIONER—Affirming in the case of the Big Sandy
Company v. Ellen W. Duryea, &c.; affirming on the
cross-appeal of Ellen W. Duryea and reversing on the
original appeals in the case of E. Rollins Morse v.
Ellen W. Duryea, &c., and in the case of Fon Rogers,
Lon Rogers and T. H. Harman v. Ellen W. Duryea, &c.

The three appeals mentioned in the caption have
been heard together and will be considered in one opin-
ion.

William F. Weld died the owner of certain coal, min-
eral and other rights in thirty-two tracts of land sit-
uated in Pike county. These rights he devised to his
widow, Ellen Weld. Thereafter his widow married H.
B. Duryea. On February 17th, 1906, Mrs. Duryea and
her husband conveyed the property to E. Rollins Morse
under a trust agreement, whereby Mrs. Duryea was to
get 25 per cent. of the gross proceeds of the sale price
of the property and Morse and C. B. Hillhouse were
each to receive 37½ per cent. of the proceeds. Morse,
however, was to pay all taxes and expenses incurred in
connection with the sale of the property. Thereafter
Morse listed the property for taxation for the years
1902, 1903, 1904 and 1905, under the 1906 statute. Later
on, he sold the property to Lon and Fon Rogers and
arranged for suit to be brought to cancel a tax deed
under which the Big Sandy Company claimed title. The

price which the Rogers Brothers paid for the property was $15.00 an acre. This was a reasonable price for the land at the time the sale was made.

After the sale to the Rogers Brothers, and five years after the conveyance to Morse, Mrs. Duryea and her husband brought this suit to cancel the conveyance to Morse and the conveyances from Morse to the Rogers Brothers, on the ground that the conveyance to Morse was obtained by fraud and the Rogers Brothers were not purchasers for value in good faith. On final hearing the chancellor set aside both conveyances, and Morse and the Rogers Brothers appeal. From that part of the judgment awarding Morse and others a lien on the land for certain expenses and services Ellen W. Duryea prosecutes a cross-appeal.

After stating that she met Morse on the train between Boston and New York and had a conference with him, Mrs. Duryea testified as follows:

"Q. Will you just give as near as you can the purport and substance of that conversation and how it was brought about—I mean, I mean how the conference originated? A. I do not remember exactly what led up to it, but Mr. Morse told me about some lands in West Virginia or Kentucky of which he held the title to the land and I had the title of the mining right, and that my titles were no good, but that if the two were—that if I would give Mr. Morse my title or supposed title, he could make something out of it—that they were perfectly worthless as they were. Q. When you speak of Mr. Morse's statement to the effect that they were perfectly worthless as they were, did that mean the title or claim which you owned? (Obj.) A. Yes. Q. Do you understand that at this conference between yourself and Mr. Morse, that he told you that he had a superior title to the property? (Obj.) A. His title was all right because he had the property. Q. Did he go into any details and explain the nature or character of his title, or was his statement general to the effect that his title was better and superior to yours? (Obj.) A. His title was all right and mine was worthless. Q. When Mr. Morse made this statement to you about the worthlessness of your title and the validity of his title, you may state whether or not you believed the statement. (Obj.) A. Yes, I believed it all—I believed it absolutely. Q. At the time that these statements respecting the invalidity of

your title and the validity of Mr. Morse's title, what reliance did you place upon the statements? (Obj.) A. I took Mr. Morse's word. Q. You may state whether or not you believed that word. A. I believed it perfectly. Q. What was the result of this conference between yourself and Mr. Morse—I mean what action upon your part did that conference result in? A. It resulted in my going back to Mr. Duryea and asking him to do what Mr. Morse asked me to do. Q. Did that conversation lead up to and result in the conveyance which you and Mr. Duryea made to Mr. Morse under date of February 17th, 1906? A. Yes, sir; it did."

She further testified that Mr. Morse did not pay any consideration for the deed and that she would not have executed it if she had known that Mr. Morse's title or claim to the property was wholly defective. On cross-examination she stated that the conversation took place five or six years before she testified, but she was unable to fix the exact date. She further said that she always turned over her business affairs to her husband, Mr. Duryea. She did not recall Mr. Morse's having spoken to her about Virginia land grants, or mineral claims or tax titles. She understood that her titles were no good; thought may be Mr. Morse did tell her that the land had been sold for taxes. She then went home and told Mr. Duryea and put the matter in his hands. She remembered that she had it in mind not to spend any more money on the title, but did not recall whether she told Mr. Morse that or not.

Mr. Duryea testified that Mrs. Duryea told him of the conference she had had with Morse and a day or two later he made an engagement to take up the matter with Morse at the latter's office. Mr. Hillhouse was also present. He then testified as follows:

"Q. What agreement did you arrive at? A. We talked the whole thing over. Mr. Hillhouse had a number of maps and they talked about the title of the property and about having some mineral rights. They represented that through old grants that they owned the land in fee simple, mining rights and everything else, of that property; that the title or the rights which were conveyed to Mrs. Duryea through the will of Mr. Weld—and conveyed to him, as I understand, by that Virginia Mining & Improvement Company, consisted simply of mining rights on that property which were derived subse-

quent to the original rights which they held. These rights were inoperative by themselves—these rights held by Mrs Duryea—absolutely inoperative and worthless. (Obj.)   Q. When you say that it was represented these rights were inoperative and no good, whose rights did you refer to?   A. I referred to Mrs. Duryea's rights.   Q. The rights which she had under the will of Mr. Weld? A. Yes, sir; conveyed to him by the Virginia Mining & Improvement Company.   Q. What representations, if any, were made at that conference by Mr. Morse respecting the validity of his title under the old grant?   (Obj.) A. He said he had the absolute title.   Q. Did you rely upon that statement of Mr. Morse as being true and correct?   A. I did, absolutely. Q. You may state whether or not you relied upon that as a  moving cause that prompted you and Mrs. Duryea to execute this deed on February the 17th, 1906?   A. I did.   (Obj.) ''

He also testified that under the arrangement with Morse, Mrs. Duryea was to receive 25 per cent. of the proceeds of the property, while Morse was to pay all the taxes and expenses in connection with the property. On being asked to state exactly what Mr. Morse said to him, he answered as follows: ·

''A. Mr. Morse told me that—I am certain he said he represented a company, or that they were forming a company, or that a company had been formed—no, as to that I am not certain.   He introduced Mr. Hillhouse and Mr. Hillhouse explained all about these details—all about the titles they had from these old grants which had come down from the State of Virginia, as I understand it, about these titles that he had, and generally all these titles to this land by which they held not only the land in fee simple, but everything on it.   He explained that the title which Mrs. Duryea had was to mining rights, which I knew, and which had come to her or had been conveyed to her subsequent to the rights which Mr. Morse had, and that therefore under that mining right, the property was inoperative, could not be operated at all, and that Mr. Morse's right and title to this land— the general impression was that these rights which he held and Mr. Hillhouse held, or his company had, were the rights—the only real valuable rights to the whole mining situation down there—the whole section of the country.   He showed me a map; I did not pay much attention to it.   I saw the map and he jotted down—I

won't swear to this, but it is my impression—I think Mr. Hillhouse jotted down in some part of that map; it is my impression he did, where these different pieces, the thirty-two pieces of mining rights were conveyed to Mrs. Duryea—about where they were, in what section of the country. This is only my impression, and I won't swear to it. We talked the whole thing over. He said they were inoperative—that the property had been sold for taxes. Mrs. Duryea told me that first, I think. I might have learned it about this time. I spoke to Mr. McCook about letting them go for taxes, that it was a careless proceeding and everything of that kind. He told me they were—the taxes—whether he told me that or whether I found it out afterward, I don't know—that the title that had been taken by the Big Sandy Company, but I knew it——. Q. But you knew the taxes had not been paid? A. Mr. Morse told me that taxes had not been paid and that the property had been sold, but whether sold to the Big Sandy or not, I don't remember, but I knew it directly after that. Q. Mr. Morse and Mr. Hillhouse told you substantially, did they not, that there were conflicting titles there? A. No, they did not; no conflicting titles at all. They said they owned absolutely everything according to their grant, but that this title might come up as a sort of stumbling block, but that the title itself was inoperative without their title—that these mining rights were inoperative without the combination of the original right given to the parties they represented, or from whom they got them, which were prior to the mining rights which were transferred by the Virginia Mining Company to Weld, and left by Mr. Weld to Mrs. Duryea. Q. In other words, whatever right, title and interest they got from you would have to have something added to it to make it a marketable title? A. Yes, to make anything. I mean, to be of any use. Q. You must have understood, did you not, that Mr. Morse admitted that your title was worth something when he thought it should be acquired? A. What I thought was, that to operate this thing without any friction, his company— his rights—that for that purpose it would be better for him to acquire these mining rights to stop any adverse claims or talk about the title—in other words, to perfect title to the land. Q. To quiet litigation, you mean? A. Yes, or anything that might come up in that way. Q. Did it occur to you at the time that if Mr. Morse claimed

to have these lands or to hold or control the fee simple of these lands, that he would not need any other title? A. Well, I knew he did want it. Q. Do you know what to hold land in fee simple means? A. Yes, I think I do. I do not know that I can give you a lawyer's definition. Q. What is the best answer you can give? A. Land ownership. Q. Exclusive of any other title? A. Yes. Q. Did it not occur to you that if he held or controlled such a title, that he would not be likely to be desirous of acquiring any other title? A. No, it did not. It was just exactly like any other insecure title—a title that might be insecure, which they might make secure by—I think that without it was worthless—inoperative, without combination of the two. Q. Then you did not really understand that he claimed that he owned the title in fee simple? A. I did. Q. You have just given your definition, and it seems to me a good one, that title in fee simple means the right to land, exclusive of every other claim. A. That is what he said he had. Q. Did it not occur to you that Mr. Morse having or controlling such a title would not need any other? A. Well, that is a hard thing to answer. Q. Did that not occur to you? A. No, it did not. Q. How long did that interview last? A. It lasted about half an hour, I should say. Q. Only half an hour. A. I should think so. I know it was a short interview—not very long. Q. You would be surprised if it had lasted an hour, wouldn't you? A. I think I would, but I am not very greatly surprised; I did not keep time on it. Q. There was quite some talk there, was there not? A. Yes. Q. And Mr. Hillhouse explained the situation to you? A. He explained the whole situation. Q. Generally, about the condition of the titles at that time, there? A. Yes. Q. Did he refer to the Virginia grant? A. I think he did. Q. And to the mineral rights to land in Kentucky. A. I am not certain about that. Q. You knew Mrs. Duryea's rights were mineral rights, did you not? A. Absolutely, and that these rights were acquired at a subsequent date to the fee simple and the rights they held in that property and that her rights were no good. Q. Did Mr. Hillhouse or Mr. Morse refer to the fact that certain occupants of the land claimed title thereto? A. That I don't remember. Q. Did they refer to the fact that some of the land had been sold for taxes? A. My land? Q. Yes. A. Of course they did. Q. They did? A. Of course they did. Q.

From your knowledge of real estate, you recognize that when land is sold for taxes, that the title no longer remains in the original holder? A. I do. Q. That it is inoperative—that the title is inoperative and that you cannot deed lands which have been sold to someone else for taxes? A. I know I did. Q. But you did not give a good title to the lands, did you? A. I don't know about that; it depends upon whether the other person can sustain the tax title, whether it is good or not."

On being asked the question, "Did you not in substance state to Mr. Morse and Mr. Hillhouse that you regarded the title that you and Mrs. Duryea held, or either of you in these lands, as not worth any further expenditure by either of you?" Mr. Duryea answered: "I do not think I did. I think I told him I had been informed that titles in that section of the country were very shaky."

Mr. Morse testified that for a long time he had been trying to consolidate some titles or claims to titles to coal lands in Kentucky. Mr. Hillhouse, who owned numerous Virginia land grants, suggested the idea of putting Mrs. Duryea's lands into the consolidation. Thereupon he arranged a conference with Mr. Duryea; Mr. Hillhouse was present. At that conference he told Mr. Duryea that his wife's land had been sold for taxes, but that she still had the right of redemption. Mr. Duryea said that he was unwilling to put up any money. He (Morse) then agreed to put up the money and bear all the expense in connection with the transaction, and Mr. Duryea then agreed that, under those circumstances, he (Morse) was entitled to the greater portion of the proceeds of the sale. As he did not consider himself competent to explain to Mr. Duryea their claims under the Virginia grants, he had Mr. Hillhouse present for that purpose, and Mr. Hillhouse made a full explanation of the matter. In that conversation neither he nor Mr. Hillhouse told Mr. Duryea that they owned absolutely everything and that Mrs. Duryea's titles were worthless. Mr. Duryea then agreed to make him a deed to the property, with the understanding that he was to bear all expenses connected with the property and, upon making a sale thereof, was to pay the Duryea's 25 per cent. of the gross proceeds. Some time later he happened to meet Mrs. Duryea on the train between Boston and New York, and he then made the

same explanation to her in regard to her title as he had to Mr. Duryea. Later on he received the deed, which had theretofore been executed, but had not been delivered. Witness also stated that he had never been in Kentucky. He was only familiar with the conditions there through hearsay. Mr. Hillhouse had told him that his titles consisted of old Virginia grants, and that the Kentucky lands were settled on by squatters, who generally had no title. He further stated that the reason that Mr. Duryea gave for not wanting to spend any more money on the property was thet he hadn't any confidence in Kentucky titles.

It may be conceded that it is the established rule that the purchaser of land may rescind the contract where the contract was induced by misrepresentations as to the title of the vendor. Breckinridge v. Moore, 3 B. Mon. 629; Campbell v. Whittingham, 5 J. J. Marsh. 96, 20 Am. Dec. 241; Glass v. Brown, 6 T. B. Mon. 356; Devers v. Dallam, 6 T. B. Mon. 102; Young v. Hopkins, 6 T. B. Mon. 18; Annis v. Ferguson, 84 S. W. 553, 27 R. 56. But this rule is subject to the qualification that if the facts are disclosed so that the statement concerning the title is a misrepresentation of pure law and not a statement of fact, it is not ground for avoiding the contract. English v. Thomasson, 82 Ky. 280; Drake v. Latham, 50 Ill. 270; Conwell v. Clifford, 45 Ind. 392; Atwood v. Chapman, 68 Maine 38, 28 Am. Rep. 5. It is likewise subject to the further qualification that a mere expression of opinion by the vendor of real estate as to his title, where based upon a state of facts truthfully stated, does not constitute fraud, even though the opinion is not well founded. Saltonstall v. Gordon, 33 Ala. 149; Martin v. Wharton, 38 Ala. 637; Fitzhugh v. Davis, 46 Ark. 337; Choate v. Hyde, 129 Cal. 580, 62 Pac. 118; Howard v. Witham, 2 Me. 390; Hoyt v. Bradley, 27 Me. 242; Perkins v. Trinka, 30 Minn. 241, 15 N. W. 115; Fellows v. Evans, 33 Or. 33, 53 Pac. 491. It is clear from Mrs. Duryea's evidence, considered as a whole, that she entrusted the entire matter to the judgment of her husband. There are portions of his deposition from which it would appear that his understanding that his wife's title to the mineral rights was inoperative or worthless, was the result of a conclusion based on the fact that the land was covered by the Virginia land grants, rather than on any statement made by Morse or Hillhouse; but,

passing this phase of the case and assuming that Morse stated that the title which he and Hillhouse had was superior to that of Mrs. Duryea and her title was worthless, the question is, was this statement, if false, a misrepresentation of fact? The only facts stated by Morse and Hillhouse were that the land was covered by Hillhouse's Virginia land grants and had been sold for taxes. It is admitted that the land had been sold for taxes and, in the absence of a showing to the contrary, we must assume that the land is covered by the Virginia land grants. This statement of fact being true, we have left the mere statement by Morse that his and Hillhouse's titles were perfect and that Mrs. Duryea's title was worthless unless it was combined with his title. In considering the question, we must remember that the state of Virginia, on the 18th day of December, 1789, indicated by an act of her assembly, the terms on which she would consent to part with her sovereignty over the territory of Kentucky. That act was agreed to by Kentucky and is what is known as the "Virginia Compact." Sections 7 and 9 of that compact provided, in substance, that all private rights and interests of lands within the said district (of Kentucky) derived from the laws of Virginia prior to such separation, should remain valid and secure under the laws of the proposed state, and should be determined by the laws then existing in the state of Virginia; and that no grant of land or land warrant thereafter issued by the proposed state should interfere with any warrant theretofore issued from the land office of Virginia, which should be located on land within said district then liable thereto, on or before September 1st, 1791. After the acceptance of the compact, provision was made for transferring from the records of Virginia the evidence of grants and conveyances of land in the old district of Kentucky. For a period of over one hundred years the state of Kentucky endeavored, by numerous acts, to forfeit or invalidate all titles granted by the state of Virginia. These various acts, however, were held unconstitutional, either by the Supreme Court of the United States or the Court of Appeals of this state. Green v. Biddle, 8 Wheat. 1, 5 L. Ed. 547; Marshall v. McDaniel, 12 Bush 378; Shaw v. Robinson, 111 Ky. 715, 64 S. W. 620. It was not until the year 1906 that a valid act, providing for the forfeiture of land titles for a failure to list them for taxation and to pay the taxes due on certain dates, was passed.

Eastern Ky. Coal Lands Corp. v. Commonwealth, 127 Ky. 667, 106 S. W. 260, 219 U. S. 140. The conveyance from the Duryeas to Morse was made prior to the enactment of this statute and at a time when all efforts of the legislature to forfeit or invalidate title under Virginia land grants had failed, and at a time when there was great confusion, not only among the people, but among lawyers, as to the precise effect of such grants upon the validity of titles subsequently granted by the state of Kentucky. Morse was not a lawyer, had never been in Kentucky, and was not an expert on land titles in this state. He had Hillhouse with him for the purpose of explaining his claim under the Virginia land grants. The Duryeas were in possession of their title papers and must be presumed to have been acquainted with their own title. The title under which Morse and Hillhouse claimed was laid before Duryea. Duryea himself admits that Hillhouse "explained all about these details—all about the titles they had from these old grants which had come down from the state of Virginia." Thus Duryea was in possession of all the facts. All of the parties realized that Kentucky land titles were uncertain and none of them had any superior knowledge on the subject. Under these circumstances, Morse, without misrepresenting or concealing a single fact, stated that he and Hillhouse held the superior title. Whether his view of the matter was correct or not, we deem it unnecessary to decide. Even if incorrect, his statement was in no sense a misrepresentation of fact, but was simply an erroneous expression of opinion as to which was the superior title, and, at most, a mere misrepresentation of pure law. We, therefore, conclude that the misrepresentation, even if made, is not sufficient to authorize a rescission of the deed from Duryea to Morse.

The contention that the conveyance from the Duryeas to Morse was made without consideration is equally untenable. While no money consideration passed between the parties, it is clear that the conveyance was made in consideration of the agreement by Morse to make a sale of the property, bear all of the expense incident thereto, and to turn over to the Duryeas 25 per cent. of the gross proceeds of the sale. Not only was this agreement on Morse's part sufficient to support the contract, but the agreement was substantially executed when this suit was brought to set aside the conveyance.

Since the conveyance from the Duryeas to Morse was valid, it likewise follows that the conveyances from Morse to Fon and Lon Rogers were also valid. It necessarily results that the chancellor erred in setting aside the conveyance from Duryea to Morse and the two conveyances from Morse to Fon and Lon Rogers.

On the appeal of T. H. Harmon the following facts appear: Harman intervened in the action and set up a judgment lien on the land for $7,000.00, and also a claim for $9,367.50 as commission for effecting a sale of the property to the Messrs. Rogers. It seems that Harman was employed by Morse to list the property in question and other property for taxation under the act of 1906. For his fee and expenses of $10,000.00, he brought suit against Morse and had attachments levied on the property. During the pendency of the suit Morse paid him the sum of $1,000.00 on account. After that, judgment was rendered in his favor against Morse and others for the sum of $9,000.00 and a lien awarded him on the property in controversy. After the judgment was rendered, Morse paid Harman the sum of $2,000.00, leaving due a balance of $7,000.00, secured by judgment lien. Thereafter Morse, by written contract, employed Harman to sell the property and agreed to pay him a commission of 10 per cent. of the purchase price. After considerable effort Harman succeeding in making the sale to Messrs. Fon and Lon Rogers at the price of $15.00 per acre. Proceeding on the theory that the conveyance from the Duryeas to Morse was obtained by fraud, the chancellor held that Harman was entitled to a lien on the land for only such services as he performed in connection with the property in controversy, and fixed his allowance for such services at $2,000.00 and rejected altogether his claim for a commission. Whether this judgment would have been proper if the finding of the chancellor respecting the conveyances from the Duryeas to Morse and from Morse to the Messrs. Rogers had been sustained, it is unnecessary to determine. When Harman performed the services for Morse, the absolute title was in Morse, and Harman had no knowledge whatever of the trust agreement under which Morse held. Under these circumstances, his judgment lien for $7,000.00, with 6 per cent. interest from February 11th, 1909, was obtained. Since the deeds from the Duryeas to Morse and from Morse to Lon and Fon Rogers have

been held to be valid, we perceive no good reason why the full amount of Harman's judgment lien is not enforcible against the property, especially in view of the fact that after its payment the proceeds of the sale to the Messrs. Rogers will be far more than sufficient to pay the amount going to Mrs. Duryea under the trust agreement. It follows that the chancellor erred in reducing the amount of his judgment lien to $2,000.00.

The chancellor, however, did not err in refusing to award Harman a lien for his commission of $9,367.50 for making a sale of the property. His services in this respect were not those of an attorney, but those of an ordinary real estate broker, and were not, therefore, of such a character as to entitle him to a lien on the property. Nor can we, in the present state of the record, award him a personal judgment against Morse, since no such judgment was asked. As the Duryeas are no longer interested in Harman's claim for a commission, and since that question was not litigated between him and Morse, the conclusion that Harman is not entitled to a lien on the property for such claim will not prejudice Harman's right to litigate this question on the return of the case.

The appeal of the Big Sandy Company is from a judgment setting aside a tax sale under which it claims title. It appears that the lands in controversy were sold by the sheriff of Pike county on December 28th, 1896, for taxes due for that year. M. W. Hellier became the purchaser. Thereafter the lands were conveyed to M. W. Hellier by the sheriff. On May 28th, 1902, M. W. Hellier conveyed the property to the Big Sandy Company of Virginia, which in turn conveyed the same to the Big Sandy Company of Maine. One branch of this suit was to set aside the tax sale and the subsequent deeds, and numerous irregularities were assigned. Though the judgment of the chancellor might be sustained on other grounds, we deem it necessary to consider only the following. At the time of the sale the title was in Ellen W. Duryea, a married woman. Section 4156 of the Kentucky Statutes is as follows:

"Any minor, or other person laboring under legal disability, except a lunatic or married woman, at the date of sale, shall have one year after the removal of the disability within which to redeem such property, which may be done by paying the purchase money, with fifteen

per centum on the amount thereof, and interest at the rate of ten per centum per annum from the date of the sale, and the costs of the sale. But any purchaser, other than the state, county and district, shall forfeit his right to his purchase, unless within six months after the sheriff shall have delivered to him a certificate of his purchase hereinafter provided for, he shall, in writing, give notice of his purchase to both husband and wife, in case the purchase be of land of a married woman, or to the statutory guardian of an infant, if there be one; if not, to the parent; if none, to the persons having in charge such infant, if the purchase be of the land of an infant; or to the committee of the lunatic, if one; if none, then to the person having charge of such lunatic, if the purchase be of the land of a lunatic. If the lands of a lunatic or married woman be not redeemed within five years from the reception of the notice, the sale shall become absolute.''

It will be observed that the foregoing statute provides that any purchaser, other than the state, county and district, shall forfeit his right to his purchase, unless within six months after the sheriff shall have delivered to him a certificate of his purchase, he shall, in writing, give notice of his purchase to both husband and wife, in case the purchase be of land of a married woman; and that if the lands of a married woman be not redeemed within five years from the reception of the notice, the sale shall become absolute. Construing this statute, it has been held that the purchaser of the land of a married woman at a tax sale acquires only an equity, which he can perfect by giving to her and her husband, within the time fixed by the statute, a notice to the effect that he has bought the land from the sheriff at a tax sale; and that when it is affirmatively pleaded and proven that such notice was not given within the time prescribed, the purchaser is without remedy, and the sale is invalid. Hatcher v. Howes, 138 Ky. 464, 128 S. W. 335. Here the sale was made by the sheriff, the purchaser was an individual and it is pleaded and clearly proven that the required notice was not given. It follows that the chancellor did not err in setting aside the tax sale and the subsequent deeds through which the Big Sandy Company acquired title.

In the case of the Big Sandy Company v. Ellen W. Duryea, &c., the judgment is affirmed. In the case of

E. Rollins Morse v. Ellen W. Duryea, &c., and in the case of Fon and Lon Rogers and T. H. Harman v. Ellen W. Duryea, &c., the judgment is affirmed on the cross-appeal of Ellen W. Duryea and reversed on the original appeals and cause remanded for proceedings consistent with this opinion.